UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Vicki L. Boutsianis**

   v.         Case No. 07-cv-250-PB
              Opinion No. 2008 DNH 065
**Michael J. Astrue, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

  Vicki Boutsianis moves to reverse the Social Security
Administration's denial of her claim for Supplemental Security
Income ("SSI") and Disability Insurance Benefits ("DIB") under
Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423
and 1382.  Boutsianis applied for DIB and SSI on February 15,
2005, alleging disability since October 5, 2004 as a result of
knee impairments, hip pain, multiple joint arthritis, heel spurs,
and depression.  The Commissioner denied Boutsianis's application
initially and on reconsideration.  Administrative Law Judge
("ALJ") Matthew J. Gormley III held a hearing on August 11, 2006,
and issued a decision in which he concluded that Boutsianis was
not disabled.  The Appeals Council denied Boutsianis's request
for review, and she appealed the ALJ decision to this court,

pursuant to 42 U.S.C. § 405(g).  For the reasons that follow, I grant Boutsianis's motion to reverse, deny the Commissioner's motion to affirm, and remand this case for further administrative proceedings.

## I.   BACKGROUND[1]

### A.   Procedural History

Boutsianis applied for DIB and SSI on February 15, 2005, alleging an inability to work since October 5, 2004, due to knee impairments, hip pain, multiple joint arthritis, heel spurs, and depression.  Tr. at 56-62.  The Social Security Administration ("SSA") denied Boutsianis's application on August 30, 2005, and Boutsianis requested an administrative hearing.  Tr. at 25-28; 33.

On August 11, 2006, ALJ Gormley held a hearing at which Boutsianis testified and was represented by counsel.  Tr. at 199-215.  On November 22, 2005, the ALJ issued a written decision finding that Boutsianis was not disabled within the meaning of

---

[1] Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts (Doc. No. 10) submitted by the parties.  Citations to the Administrative Transcript are indicated as "Tr."

the Act.  Tr. at 10-20.  Pursuant to 20 C.F.R. §§ 404.1520 and
416.920(a), the ALJ used a five-step process to make this
finding, considering:  (1) whether the claimant is engaged in
substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the impairment meets or equals a
specific listing of impairment in the SSA regulations and meets
the duration requirement; (4) assessment of residual functioning
capacity ("RFC") and whether the claimant can still do past
relevant work; and (5) assessment of claimant's RFC, age,
education, and work experience, to see if claimant can make an
adjustment to other work.[2]  See 20 C.F.R. §§ 404.1520 and
416.920(a).

The ALJ concluded that Boutsianis had not engaged in
substantial gainful activity since October 5, 2004, that
Boutsianis had the severe impairments of heel spurs, arthralgias,
and depression, and that Boutsianis's impairments did not meet

_____

[2] The claimant has the burden of proof for the first four
steps of this process.  Freeman v. Barnhart, 274 F.3d 606, 608
(1st Cir. 2001).  If the claimant meets her burden of proof at
the first four steps, the burden shifts to the Commissioner, who
must come forward with evidence of specific jobs in the national
economy that the claimant can still perform despite her
impairment.  Id.

the criteria of any "listing of impairment" in the social
security regulations.  Tr. at 13-14.  At step four of the
analysis, the ALJ analyzed Boutsianis's medical records and
concluded that the medical evidence in the record failed to
substantiate Boutsianis's "subjective allegations of total
functional incapacity."  Tr. at 16.  The ALJ concluded that
Boutsianis's allegations of pain were not entirely credible and
that the record did not show that her pain was completely
disabling.  Tr. at 17.

The ALJ concluded that Boutsianis retained the RFC to sit,
stand, or walk for up to six hours in an eight-hour work day;
occasionally lift and carry twenty pounds and frequently lift and
carry ten pounds; occasionally balance, climb, stoop, kneel,
crouch, or crawl; understand, remember, and carry out simple
instructions; make judgments on simple work-related decisions;
interact appropriately with others in a work setting; and respond
appropriately to normal work pressures and changes in a routine
work setting.  Tr. at 18.  Nevertheless, the ALJ found that
because Boutsianis's past relevant work as a restaurant manager
required her to lift and carry 50 to 100 pounds, Boutsianis could
no longer perform her past relevant work.  Id.

The ALJ then concluded, at step five of the analysis, that there were a significant number of jobs in the national economy that Boutisanis could still perform, given her RFC.  Id.  The ALJ utilized the Medical-Vocational Guidelines ("the Grids") and concluded that based on Boutsianis's age, education, and RFC, the tables directed a finding of not disabled.  Tr. at 19; see 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 2.

B.   **Medical History**

Boutsianis was forty-five years old when she applied for SSI and DIB in February 2005.  Tr. 46-53.  She is a high school graduate who can speak, read, and write in English.  Tr. at 56. Prior to the alleged onset of her disability on October 5, 2004, she had worked as a restaurant manager for almost 20 years.  Tr. at 57.  The record contains detailed medical records from December 2004 to July 2006.

In December 2004, Boutsianis saw Diane Bernard, a Certified Physician's Assistant, for complaints of heel spurs.  Tr. at 130-34.  Boutsianis also reported pain with walking, joint pain, problems dropping things, and hip pain.  Tr. at 130.  Bernard conducted a physical examination, which showed all of Boutsianis's systems to be normal, except for tenderness over the

-5-

heel of the right foot.  <u>Tr.</u> at 131.  Bernard noted that Boutsianis complained of back pain, joint pain, muscle weakness, stiffness, and anxiety.  <u>Id.</u>  Bernard diagnosed heel spurs and arthralgia, and prescribed Bextra (a nonsteroidal anti-inflammatory drug) and Flexeril (a muscle relaxant).  <u>Tr.</u> at 132.

Boutsianis saw Bernard again in January 2005 for heel spurs. <u>Tr.</u> at 135–36.  Boutsianis reported that her heel spurs were slightly better but that she had ongoing pain in her hips and legs, such that she could not stand for any length of time or sit for more than thirty minutes without pain.  <u>Id.</u>  She stated that none of the medications were helping her pain, and also requested information about diet and cholesterol.  <u>Id.</u>  Bernard again prescribed Bextra and Flexeril, and added Elavil, an antidepressant.  <u>Id.</u>

In February 2005, Boutsianis saw Bernard for a follow-up visit.  <u>Tr.</u> at 137–38.  Boutsianis reported that the medications were working well, although she had not taken Elavil because of the possible side effects, and requested a different medication for depression.  <u>Id.</u>  In her assessment, Bernard noted that Boutsianis's heel spurs and arthralgia had improved.  <u>Id.</u> Bernard prescribed Prozac.  <u>Id.</u>

Boutsianis visited Bernard again in March 2005 for a breast cancer screening.  Tr. at 139-41.  At that visit Boutsianis reported that she was doing well but was experiencing occasional anxiety attacks and requested a medication to take as needed. Id.  Bernard prescribed Xanax.  Id.

In April 2005, Boutsianis saw Bernard and complained of heartburn after every meal, nausea, and dizziness.  Tr. at 143-45.  Upon examination, Boutsianis also complained of tinnitus and headaches, and Bernard observed mild epigastric tenderness with palpation in Boutsianis's abdomen.  Id.  All other systems were reported to be normal.  Id.  Bernard diagnosed new problems of heartburn and chronic, bilateral tinnitus.  Id.  She prescribed additional medications of Meclizine (an antihistamine) and Prevacid (a heartburn medication).  Id.

Boutsianis returned for a follow-up appointment with Bernard later in April 2005.  Tr. at 146-48.  At this appointment, Boutsianis reported that Prevacid was helping her heartburn, but that Flexeril was not working as well as before.  Id.  She reported using nasal spray daily and requested something else to help with her stuffy nose, and she also requested a referral to a psychiatrist.  Id.  Bernard noted that Boutsianis complained of

nasal congestion, change in sleep habits, and depression, but that Boutsianis denied having anxiety.  Id.  Bernard diagnosed new problems of depression and nasal congestion and noted that Boutsianis's heartburn had improved, but that her tinnitus, arthralgia, and heel spurs were unchanged.  Id.  Bernard took Boutsianis off Bextra, switched Prevacid for Prilosec, increased the dosage of Flexeril and Elavil, and prescribed the additional medications of Flonase and Zyrtec for the nasal symptoms.  Id.

In June 2005, Boutsianis saw Bernard and stated that her sciatic nerve had been bothering her and that Xanax was not helping her anxiety.  Tr. at 151–52.  She requested a note that she could not work until her disability could be evaluated.  Id. Bernard gave Boutsianis the note, recommended counseling, and substituted Buspar for Xanax.  Id.

Boutsianis saw Certified Physician's Assistant Kimberly Gallant in September 2005 for a follow-up visit.  Tr. at 154–56. Boutsianis reported that Flexeril was not working and requested more Ranitidine for heartburn.  Id.  Boutsianis stated that Elavil was effective in helping her sleep, but that her other medications including Prozac, Meclizine, and Buspar were not effective.  Id.  Boutsianis also stated that she had a history of

-8-

fibromyalgia that was diagnosed in winter 2004, and attributed her tinnitus and the pain her neck and lower extremities to fibromyalgia.  Id.  Gallant noted the new problems of fibromyalgia, a family history of abdominal aortic aneurysm, and anxiety.  Id.  Gallant prescribed Prilosec, Ranitidine, Flexeril, and Prozac (at an increased dosage), and removed Buspar.

In December 2005, Dr. Kenneth Shuman referred Boutsianis to physical therapy for the conditions of:  "fibromyalgia, left groin strain, left arm strain, triceps/latissimus dorsi, left thumb (trigger finger), and restless leg syndrome."  Tr. at 113. At her first physical therapy session in January 2006, the therapist noted that Boutsianis reported that her left arm pain stemmed from a fall on the ice two years prior.  Tr. at 174.  At this first session the therapist also noted that Boutsianis had a decreased range of motion, decreased joint mobility, pain upon palpation in her left shoulder, restricted mobility in her spine at level C2–C7, and a winging left scapula.  Tr. at 175–76.

Boutsianis was discharged from physical therapy in March 2006 after 8 visits; she reported that her left shoulder was much better.  Tr. at 177–80, 189.  Later in March 2006, she received occupational therapy for triggering in her left thumb.  Tr. at

-9-

182.  After three visits to occupational therapy, the therapist

noted a lack of improvement and recommended that Boutsianis

revisit her doctor to consult about whether to continue with

occupational therapy or treat with cortisone injections.

**C.    Assessments and Reports in Connection with**
       **Applications for Benefits**

Bernard filled out a Medical Report in connection with

Boutsianis's application to the City of Rochester, New Hampshire,

Welfare Department for financial assistance.  <u>Tr.</u> at 69.  The

report is dated both January 21, 2005, and April 26, 2005.  <u>Id.</u>

Bernard stated in the report that Boutsianis was permanently and

totally disabled, such that she could do no work until further

notice.  She listed her diagnoses, in order of importance, as:

(1) arthralgia, (2) heel spurs, and (3) fibromyalgia.  <u>Id.</u>

On March 30, 2005, Boutsianis filled out an Activities of

Daily Living Report in connection with her applications for DIB

and SSI.  <u>Tr.</u> at 72-77.  In this report, Boutsianis stated that

her activities were very limited due to severe and constant pain.

<u>Id.</u>  She reported that, on a daily basis, she awoke with stiff

and painful muscles and alternated periods of rest with short

periods of housework.  <u>Tr.</u> at 72.  Boutsianis also stated that

-10-

she had trouble remembering and concentrating when reading and watching television.  <u>Tr.</u> at 73–74.  She reported that she went out infrequently, but that she occasionally drove and that she regularly cared for her pets.  <u>Tr.</u> at 73.  Boutsianis also filled out a pain questionnaire, reporting that her pain began in late 2002 and had worsened over time.  <u>Tr.</u> at 76–77.  She stated that chronic pain and depression limited her activities, and that her pain medication worked sometimes within one hour or two and worked for four to six hours.  <u>Id.</u>

On June 17, 2005, Dr. Joseph Cataldo completed a physical RFC assessment of Boutsianis based on a full review of Boutsianis's medical records.  <u>Tr.</u> at 157–65.  Dr. Cataldo concluded that the degree of limitations expressed by Boutsianis were not supported by the total evidence in the file.  <u>Tr.</u> at 163.  He found that she did suffer from osteoarthritis in her right heel, but that her claim of fibromyalgia was unsubstantiated by the record.  <u>Tr.</u> at 157, 165.  He also noted that the Treatment Source Opinion completed by Bernard in connection with Boutsianis's welfare application was not signed by a physician, and the statement in that report that Boutsianis was disabled was not supported by the medical evidence in the

record.   Tr. at 163; see also Tr. at 69.

On June 25, 2005, Boutsianis saw psychologist Dr. Thomas
Lynch for assessment of affective disorders and/or anxiety-
related disorders.   Tr. at 166-72.   Dr. Lynch noted that
Boutsianis had experienced significant losses in her life,
including both parents, a brother, and a long-term boyfriend.
Tr. at 166.   He observed that, upon examination, Boutsianis
demonstrated moderate difficulties with concentration and short-
term memory.   Tr. at 170.   Dr. Lynch concluded that, due to her
anxiety and depression, Boutsianis could have difficulty
finishing tasks without being able to work at her own pace and
take breaks as needed and that she could have difficulty keeping
up with a routine.   Tr. at 171.   He concluded that Boutsianis had
adequate social skills and that her problems with concentration
and short-term memory would improve with treatment for anxiety
and depression.   Id.

Dr. Nicholas Kalfas completed a Psychiatric Review Technique
form on July 8, 2005, assessing Boutsianis from the period of
October 5, 2004, to July 8, 2005.   Tr. at 85-98.   Dr. Kalfas
concluded that Boutsianis had a non-severe impairment with a co-
existing non-mental impairment requiring referral to another

-12-

medical specialty.  Tr. at 85.  Specifically, Dr. Kalfas
concluded that Boutsianis showed signs of a depressive syndrome
with sleep disturbance, decreased energy, feelings of guilt or
worthlessness, and difficulty concentrating or thinking.  Tr. at
88.  Dr. Kalfas did not conclude that Boutsianis suffered from
any other psychiatric condition, including anxiety.  Tr. at 85–
98.  He noted that Boutsianis's activities of daily living and
ability to maintain concentration, persistence, or pace were
mildly limited, and he found that Boutsianis had no limitations
in social functioning.  Tr. at 95.  Finally, Dr. Kalfas concluded
that Boutsianis did not meet the requirements of a listing of
impairment for a psychiatric problem.  Tr. at 96.

On July 31, 2006, Dr. Kenneth Shuman filled out two Medical
Source Statements ("MSS") of Ability to do Work–Related
Activities reports on Boutsianis's behalf, one focusing on
physical, and the other on mental limitations.  Tr. at 190–93;
194–96.  In the MSS focusing on physical limitations, Dr. Shuman
opined that Boutsianis's impairment affected her ability to lift,
carry, push, and pull, but he did not offer more specific
information about Boutsianis's limitations, stating that he had
not tested her for these limitations.  Tr. at 190–91.  Dr. Shuman

did state that Boutsianis must periodically alternate sitting and standing, could occasionally balance, and could never climb, kneel, crouch, crawl, or stoop.  <u>Tr.</u> at 191.  Dr. Shuman also stated that Boutsianis was limited in her ability to reach, due to joint pain, but that she was unlimited in her ability to handle, finger, and feel.  <u>Tr.</u> at 192.  Finally, he stated that Boutsianis's impairments required limited exposure to temperature extremes, dust, humidity/wetness, hazards, fumes, odors, chemicals, and gases, due to her significant allergies to dust. <u>Tr.</u> at 193.

In the MSS focusing on mental limitations, Dr. Shuman stated that Boutsianis's ability to understand, remember, and carry out instructions was affected by her impairment, and that, due to depression and anxiety, she had slight limitations in her ability to understand and remember detailed instructions and carry out detailed instructions.  <u>Tr.</u> at 194.  He stated that she had no limitation in her ability to understand, remember, or carry out short, simple instructions, and no limitations in her ability to make judgments on simple work-related decisions.  <u>Id.</u>  The doctor also stated that she had no limitations in her ability to interact appropriately with the public, supervisors, or co-

workers, and no limitations in her ability to respond appropriately to work pressure or changes in a usual or routine work setting.  Tr. at 195.

## II.  STANDARD OF REVIEW

I am authorized pursuant to 42 U.S.C. § 405(g) to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the Commissioner's final decision.  My review is limited to whether the Commissioner (through the ALJ and the Appeals Council) applied the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The Commissioner's findings of fact are accorded deference as long as they are supported by substantial evidence.  Ward, 211 F.3d at 655.  I must uphold these factual findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d

-15-

218, 222 (1st Cir. 1981)).  The Commissioner's factual findings
are conclusive if there is substantial evidence to support his or
her decision, even if the record "arguably could support a
different conclusion."  Id. at 770.  The findings are not
conclusive, however, when they are derived by "ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Nguyen, 172 F.3d at 35.

The Commissioner is responsible for determining issues of
credibility and for drawing inferences from evidence on the
record.  Ortiz, 955 F.2d at 769.  It is the role of the
Commissioner, not the role of this court, to resolve conflicts in
the evidence.  Id.

### III.  **ANALYSIS**

Boutsianis raises three main arguments in support of her
motion for reversal.  First, she argues that the ALJ erred when
he failed to accord controlling weight to her treating
physician's opinion regarding her nonexertional limitations.
Second, she argues that because she has nonexertional limitations
that significantly erode the occupational base for light work,
the ALJ erred when he failed to call a vocational expert to

-16-

testify at her hearing.  Third, she argues that the ALJ erred
when he failed to consider all of her impairments because he
inaccurately stated in his opinion that there was no actual
diagnosis of fibromyalgia in the record.

    For reasons discussed below, I find that while the ALJ did
not err when he declined to accord controlling weight to the
opinion of Dr. Kenneth Shuman or when he declined to consider
fibromyalgia as contributing to Boutsianis's impairment, the ALJ
did err in failing to determine whether Boutsianis's
nonexertional limitations significantly impact her ability to
perform a full range of light work.  Therefore, I remand this
case to the Social Security Administration for further
proceedings.

**A.   Treating Source's Medical Opinion**

    A "treating source" is a physician with whom the claimant
has an ongoing treatment relationship.  20 C.F.R. §§ 404.1502,
416.902.  The Social Security Administration has determined that
a treating source's medical opinion must be given controlling
weight if it is well-supported and not inconsistent with other
substantial evidence in the record.  S.S.R. 96-2p (1996).  It is
also true, however, that "[e]ven if a treating source's medical

opinion is well-supported, controlling weight may not be given to the opinion unless it is also 'not inconsistent' with the other substantial evidence in the case record." Id.  Thus, the ALJ must determine whether a medical opinion from a treating source is both "well supported" and "not inconsistent" in a given case. Id.  As the SSA states:

> Sometimes, there will be an obvious inconsistency between the opinion and the other substantial evidence; for example, when a treating source's report contains an opinion that the individual is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the statements of the individual's spouse about the individual's actual activities, or when two medical sources provide inconsistent medical opinions about the same issue.

Id. at 3.

Additionally, Social Security Ruling 96-2 states that for a treating source's opinion to be given controlling weight, the adjudicator "must find that the treating source's medical opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion." Id. at 2.

In this case, Boutsianis contends that the ALJ erred by not according controlling weight to the opinion of Dr. Kenneth Shuman

-18-

as expressed in the two Medical Source Statements he filled out

in July 2006.  See Tr. at 190-96.  In the physical MSS, Dr.

Shuman stated that Boutsianis had the following limitations (Dr.

Shuman's medical or clinical findings to support each limitation

are also noted):

> 1) Exertional limitation –  Must periodically alternate
> sitting and standing to relieve pain or discomfort.
> Supporting medical/clinical finding:  none.
>
> 2) Postural limitations –  Can never climb, kneel, crouch,
> crawl, or stoop, and can only occasionally balance.
> Supporting medical/clinical finding: "can walk down the hall
> without staggering."
>
> 3) Manipulative limitation – Can only occasionally reach in
> all directions.  Supporting medical/clinical finding:
> "joint pain."
>
> 4) Environmental limitation – Limited ability to tolerate
> exposure to temperature extremes, dust, humidity/wetness,
> hazards, and fumes.  Supporting medical/clinical finding:
> "has significant allergies to dust."

Tr. at 190-93.

In the mental MSS, Dr. Shuman found that Boutsianis had a

slight limitation only in her ability to understand, remember,

and carry out detailed instructions.  Tr. at 194-96.  His

supporting medical/clinical finding stated that:  "Depression and

anxiety affect concentrating ability."  Id.

The ALJ noted these statements by Dr. Shuman in his opinion, but agreed with Dr. Shuman only with respect to his statements about Boutsianis's exertional and mental limitations.   Tr. at 15; 18. Because Dr. Shuman's opinions as to Boutsianis's postural, manipulative, and environmental limitations are largely unsupported by "medically acceptable clinical and laboratory diagnostic techniques" and inconsistent with other statements in the record, the ALJ did not err when he failed to give controlling weight to this opinion.

Dr. Shuman provided very little information to support his opinion on the physical MSS form.  He stated that Boutsianis suffered from "joint pain."  There are medical and clinical findings in the record to support his opinion that Boutsianis suffered from joint pain, but there are no medical or clinical findings in the record to show that joint pain prevented Boutsianis from reaching in all directions.  At most, Boutsianis's physical therapy records show problems with her left shoulder that may cause difficulty with overhead reaching with that arm, but, again, the record contains no explicit medical or clinical findings on this point.

Dr. Shuman also stated that Boutsianis "can walk down the hall without staggering" as a medical or clinical finding to support his conclusion regarding Boutsianis's postural limitations.  Even if Dr. Shuman intended to write "cannot" rather than "can," this is unsupported by other evidence in the record.  In her Activities of Daily Living report, Boutsianis says that she is able to drive to the doctor's office and the grocery store, walk down the street occasionally, and regularly care for her pets.  Tr. at 73–74.  In all of her medical records, there is no mention of difficulty walking or an affected or uneven gait.  There are no clinical findings in the record regarding an inability to climb, kneel, crouch, or crawl, or any findings regarding a limitation in Boutsianis's ability to balance.

Finally, Dr. Shuman stated that Boutsianis suffered from numerous environmental limitations due to her allergies to dust. The record does show that Boutsianis sought treatment for nasal congestion (see Tr. at 146–48), which could support Dr. Shuman's conclusion that she suffered from a dust allergy.  However, there are no medical or clinical findings in the record to support the doctor's conclusion that Boutsianis suffered from a dust allergy

or that, even if her nasal congestion could be attributed to a dust allergy, this allergy caused her to have other environmental limitations including temperature extremes, humidity/wetness, hazards, or fumes.

Because Dr. Shuman's opinions regarding Boutsianis's postural, manipulative, and environmental limitations are not supported by medical or clinical findings in the record and are, at times, inconsistent with other evidence in the record, the ALJ was not required to give these opinions controlling weight.[3]

**B.   <u>Failure to Call a Vocational Expert</u>**

Boutsianis argues that the ALJ erred when he relied on the Grids, rather than the testimony of a Vocational Expert ("VE") to conclude that she was not disabled.  When a claimant suffers from nonexertional limitations that significantly erode her

-----

[3] Boutsianis also raises the argument that the ALJ failed to develop the record by failing to request Dr. Shuman's office notes.  Boutsianis was represented by counsel throughout these proceedings but never presented these records to the ALJ, never informed the ALJ or the Appeals Council that these records existed or were required, and never requested that the ALJ subpoena these records.  In light of these facts and because Boutsianis has failed to establish prejudice resulting from the ALJ's failure to obtain these treatment notes, I find that the ALJ did not fail to develop the record.  <u>See</u> <u>Faria v. Comm'r of Soc. Sec., 1998 WL 1085810, at *1 (1st Cir. 1998)</u>.

occupational base, testimony of a VE is usually required in order for the Commissioner to meet his burden, at step five, of showing that there are a significant number of jobs in the national economy that the claimant can still perform despite her limitations.  20 C.F.R. §§ 404.1569a, 416.969a; see also Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  In this type of situation, reliance on the Grids alone is prohibited, although the Grids may serve as a framework for analysis.  Heggarty, 947 F.2d at 996.  Pain can constitute a significant nonexertional impairment that would trigger the need for VE testimony.  Nguyen, 172 F.3d at 36.

     As discussed above, the ALJ rejected many of the nonexertional limitations noted in Dr. Shuman's MSS report because they were not supported by medical or clinical findings in the record.  The ALJ did, however, find that Boutsianis had some nonexertional limitations, although he did not engage in a substantive analysis of the extent to which these nonexertional limitations eroded the occupational base for light work.  Tr. at 19.  Specifically, the ALJ stated that Boutsianis's ability to perform the full range of light work was reduced by her pain and her adjustment disorder.  Id.  While the ALJ rejected

-23-

Boutsianis's allegation that she suffered from completely disabling pain, the ALJ did recognize that Boutsianis's pain required that she be in a job where she would have the opportunity to alternate positions at her own choosing. Tr. at 17. He also concluded that her problems with anxiety and depression (referred to as an "adjustment disorder") interfered with her ability to understand, remember, and carry out detailed instructions.

At step five of the disability analysis, the Commissioner bears the burden of showing that there are a significant number of jobs in the national economy that the claimant can perform despite her limitations. In this case, the ALJ erred when he failed to analyze the extent to which Boutsianis's nonexertional impairments diminished her capacity to perform light work. The ALJ's decision in this case is similar to the ALJ decision analyzed in Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996):

> In the present case, the ALJ did not specifically articulate the nonexertional impairments that Pratts suffered. Nonetheless, in light of her reference to "his non-exertional limitations," she apparently believed that he had some. The ALJ found that the grids directed a conclusion that Pratts was not disabled even though she neither identified his nonexertional limitations nor considered whether a vocational expert was necessary. The ALJ simply proceeded directly to the ultimate question of disability

without first considering whether further testimony was necessary in light of Pratts's nonexertional impairments. Pratts, 94 F.3d at 39.

In Pratts, the Second Circuit remanded the case to the Social Security Administration and ordered that the ALJ, on remand, conduct a re-evaluation as to whether the claimant's nonexertional limitations significantly diminished his ability to perform the full range of light work. Id. Similarly, in this case, the ALJ should examine this issue on remand and, if the ALJ concludes that Boutsianis's nonexertional limitations significantly diminish her ability to perform a full range of light work, he should call a VE to testify as to whether there are a sufficient number of jobs in the national economy that Boutsianis could perform despite her limitations. See id.

## C.   **Failure to Consider All Impairments**

Boutsianis also argues that the ALJ failed to consider her fibromyalgia as contributing to her impairments because he stated in his opinion that there is no actual diagnosis of fibromyalgia in the record. The ALJ's conclusion that Boutsianis has never actually been diagnosed with fibromyalgia is supported by substantial evidence in the record. The record shows that

-25-

Boutsianis's primary care physician was Certified Physician's Assistant Diane Bernard from December 2004 to June 2005.  There is no evidence in the record that Bernard ever completed a clinical examination of Boutsianis that resulted in a diagnosis of fibromyalgia.  In December 2004, Boutsianis reported to Bernard that she was concerned that she might have fibromyalgia, but Bernard did not diagnose fibromyalgia, finding only one tender point in Boutsianis's right foot.  In September 2005, Boutsianis saw a different medical provider, Certified Physician's Assistant Kimberly Gallant.  Tr. at 154–56.  At that visit, Boutsianis told Gallant that she had a history of fibromyalgia and that it had been diagnosed in winter 2004.  Id. Gallant and Dr. Shuman, who treated Boutsianis beginning in 2006, both noted in subsequent records that Boutsianis had fibromyalgia, but the record does not show that the condition was ever diagnosed based on clinical findings or testing.

Because the record does not contain clinical findings to support Boutsianis's claim that she had been diagnosed with fibromyalgia, the ALJ did not err when he declined to consider fibromyalgia as a contributing factor to Boutsianis's impairment. See Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996)

-26-

(holding that a claimant's subjective complaints are not considered clinical findings merely because they are recorded by a doctor); see also Harvey v. Astrue, 2007 WL 2021918 (D. Me. 2007) (analyzing a similar claim in which a claimant told medical practitioners she had been diagnosed with fibromyalgia although there were no actual clinical findings to support the diagnosis and holding that the ALJ did not err by failing to consider fibromyalgia as a contributing impairment).

## IV.  **CONCLUSION**

For the reasons stated above, I grant plaintiff's motion to reverse (Doc. No. 8), deny defendant's motion to affirm (Doc. No. 9), and remand this case pursuant to sentence four of 42 U.S.C. § 405(g) to the Social Security Administration.  The Clerk is directed to enter judgment in accordance with this order and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 1, 2008

cc:  D. Lance Tillinghast, Esq.
     Seth Aframe, Esq.
     Gretchen Leah Witt, Esq.